BILAL A. ESSAYLI
Acting United States Attorney
JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division
IAN V. YANNIELLO (Cal. Bar No. 265481)
GREGORY W. STAPLES (Cal. Bar No. 155505)
DANIEL H. WEINER (Cal. Bar No. 329025)
Assistant United States Attorneys
        1400/1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-3667/3535/0813
        Facsimile: (213) 894-0142
        E-mail:    ian.yanniello@usdoj.gov
                   greg.staples@usdoj.gov
                   daniel.weiner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 24-621(B)-MWF |
|---|---|
| Plaintiff, | GOVERNMENT'S MOTION TO EMPANEL AN ANONYMOUS JURY; DECLARATION OF JARRON FARMBY AND ATTACHED EXHIBITS |
| v. | |
| DURK BANKS, et al., | |
| Defendants. | |

    Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Ian V. Yanniello, Gregory W. Staples, and Daniel H. Weiner, hereby files its Motion to Empanel an Anonymous Jury in the above-captioned trial.

//

//

This motion is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 6, 2025          Respectfully submitted,

BILAL A. ESSAYLI
Acting United States Attorney

JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division


                                /s/
IAN V. YANNIELLO
GREGORY W. STAPLES
DANIEL H. WEINER
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES.................................................ii

TABLE OF AUTHORITIES (CONT'D.)......................................iii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION..................................................1

II.   LEGAL BACKGROUND.............................................2

      A.    Empanelment of an Anonymous Jury.......................3

      B.    Reasonable Safeguards to Minimize any Prejudice..........4

III.  AN ANONYMOUS JURY IS APPROPRIATE AND NECESSARY TO PROTECT
      THE JURY'S FACT-FINDING FUNCTION AND PROTECT JUROR SAFETY......5

      A.    Defendants' Connection to Organized Criminality and
            Payments for Violence...................................6

      B.    Significant Risk of Interfere with Witnesses and the
            Judicial Process.......................................10

      C.    Potential that the Defendants' Will Suffer a Lengthy
            Incarceration if Convicted.............................14

      D.    The Extensive and Continuous National Publicity In
            This Case Further Requires Juror Anonymity..............14

      E.    Reasonable Precautions Can Safeguard Defendants' Right
            to a Fair Trial, While Still Protecting the Judicial
            Process................................................17

IV.   CONCLUSION..................................................18

# **TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE

CASES:

Godoy v. Spearman,
    861 F.3d 956 (9th Cir. 2017) ..................................... 2

Martel v. Clair,
    132 S.Ct. 1276 (2012) ............................................ 3

Morgan v. Bunnell,
    24 F.3d 49 (9th Cir. 1994) ....................................... 2

United States v. Asainov,
    618 F. Supp. 3d 105 (E.D.N.Y. 2022) ............................. 13

United States v. Aulicino,
    44 F.3d 1102 (2d Cir. 1995) ..................................... 11

United States v. Baca,
    761 F. App'x 724 (9th Cir. 2019) ............................. 4, 16

United States v. Barragan,
    871 F.3d 689 (9th Cir. 2017) ..................................... 4

United States v. Bowman,
    302 F.3d 1228 (11th Cir. 2002) .................................. 11

United States v. Boyajian,
No. CR09-933(A)-CAS, 2016 WL 225724,........................... 4, 10

United States v. Childress,
    58 F.3d 693 (D.C. Cir. 1995) .................................... 18

United States v. Darden,
    70 F.3d 1507 (8th Cir. 1995) ................................. 6, 17

United States v. DeLuca,
    137 F.3d 24 (1st Cir. 1998) ..................................... 14

United States v. Dinkins,
    691 F.3d 358 (4th Cir. 2012) ..................................... 3

## <u>TABLE OF AUTHORITIES (CONT'D.)</u>

<u>CASES</u>:                                                                                    <u>PAGE</u>:

<u>United States v. Edmond</u>,
  52 F.3d 1080 (D.C. Cir. 1995) ....................................13

<u>United States v. Fernandez</u>,
  388 F.3d 1199 (9th Cir. 2004),
  modified, 425 F.3d 1248 (9th Cir. 2005) ................. 4, 5, 17

<u>United States v. Krout</u>,
  66 F.3d 1420 (5th Cir. 1995) ....................................11

<u>United States v. Mikhel</u>,
  889 F.3d 1003 (9th Cir. 2018) ...............................5, 17

<u>United States v. Shryock</u>,
  342 F.3d 948 (9th Cir. 2003) ...............................passim

<u>United States v. Williams</u>,
  No. CR 05-920-RSWL, 2009 WL 10659328 ...........................4, 7

<u>STATUTES</u>:

18 U.S.C. § 1958..................................................14

28 U.S.C. § 1863(b)(7)..............................................3

1
<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2
**I.    INTRODUCTION**

3
This case involves a well-funded and organized attempt to kill

4
one of defendant Durk Bank's rivals at a busy gas station in Los

5
Angeles.  In broad daylight, three shooters opened fire --- including

6
with a machinegun --- missing their intended target, but killing S.R.

7
The government will prove at trial that all seven co-conspirators

8
were affiliated with defendant Banks' organization, "Only the

9
Family"; five were OTF members, and two were recruited by defendant

10
Wilson and promised a handsome reward to help kill their target.

11
To ensure a fair trial, prevent improper attempts to influence

12
jurors, and to otherwise protect the judicial process, the government

13
requests that the Court order the empanelment of an anonymous jury.

14
All factors the Court must consider weigh heavily in favor of juror

15
anonymity in this case:

16
*First*, the murder in this case was not an isolated act of

17
violence committed by OTF or its members.  In recent years, OTF

18
members and associates have committed other brazen murders, assaults,

19
and violent crimes.

20
*Second*, as this Court has already emphasized, defendant Banks

21
--- the leader of OTF --- "uses his money, influence and power to

22
endanger individuals whom he perceives as a threat."  (Dkt. 202 at

23
4.)  Defendants' vast resources, coupled with the expansive reach and

24
violent nature of OTF, further justify additional safeguards to keep

25
the jury free from intimidation and harassment.  Indeed, defendants'

26
supporters have already threatened government officials to "free

27
Durk" or face retribution.  The jury must be protected from similar

28
misconduct.

1

Additionally, from its inception, this murder case has garnered an extreme amount of media attention that will increase as trial approaches.  This case is therefore the precise circumstance where heightened measures are needed to secure the jury's safety and safeguard its factfinding mission from improper influence.

The government's proposal narrowly seeks to anonymize certain confidential information from which jurors' identity can be ascertained, without compromising the scope of information necessary for fair and fulsome voir dire.  Specifically, the government requests that the names, addresses, and specific places of employment not be revealed the public or parties, including counsel.  To ensure all parties can meaningfully engage in voir dire, the government has agreed to work with the defense to propose a thorough juror questionnaire.  Thus, both the government and defendant will have ample information from which to make meaningful decisions and challenges during the voir dire process.

## II.  LEGAL BACKGROUND

The Sixth Amendment guarantees the right to a fair trial by an impartial jury.  United States v. Shryock, 342 F.3d 948, 971 (9th Cir. 2003).  A "critical safeguard of an impartial jury" is the protection of "the jury against improper influence from outside parties."  Godoy v. Spearman, 861 F.3d 956, 958 (9th Cir. 2017).  In addition to shielding jurors from improper influence, a trial court is also "charged with the grave responsibility of guarding the safety of . . . [the] jury," and is granted "wide discretion" to adopt appropriate security measures to meet that responsibility, Morgan v. Bunnell, 24 F.3d 49, 51 (9th Cir. 1994), including by empaneling an anonymous jury, Shryock, 342 F.3d at 971.  One security measure

2

courts employ to ensure this right is the empanelment of an anonymous jury, where a court keeps confidential "certain biographical information about the jurors either from the public, or the parties, or both."  United States v. Dinkins, 691 F.3d 358, 371 (4th Cir. 2012).

This circuit employs a two-part test to determine whether the empanelment of an anonymous jury is appropriate: "where (1) there is a strong reason for concluding that it is necessary to enable the jury to perform its factfinding function, or to ensure juror protection; and (2) reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused."  Shryock, 342 F.3d at 971 (cleaned up).

## A.    Empanelment of an Anonymous Jury

A court may empanel an anonymous jury where "the interests of justice so require."  28 U.S.C. § 1863(b)(7).  This "standard contemplates a peculiarly context-specific inquiry."  Dinkins, 691 F.3d at 372 (citing Martel v. Clair, 132 S.Ct. 1276, 1287 (2012)).  In determining whether the standard is met, courts consider the following non-exhaustive factors: "(1) the defendants' involvement with organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that the defendants will suffer a lengthy incarceration if convicted; and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment."  Shryock, 342 F.3d at 971.  These factors, however, are "neither exclusive nor dispositive," and the Court should consider the totality of the circumstances in deciding

3

whether the jury requires protection. Id.; United States v. Fernandez, 388 F.3d 1199, 1244 (9th Cir. 2004), modified, 425 F.3d 1248 (9th Cir. 2005) ("Although these factors are neither exclusive nor dispositive, courts have recognized the need for jury protection based on a combination of factors . . . .").

Applying this fact-specific analysis, courts in this District --- and elsewhere --- have ordered juror anonymity in cases like this that involve (1) violent groups and/or gangs, see, e.g., Shryock, 342 F.3d at 971 (case involving Mexican Mafia); United States v. Williams, No. CR 05-920-RSWL, 2009 WL 10659328 at *2 (C.D. Cal.) (case involving Eight Trey Hoover gang); (2) significant media attention, see, e.g., United States v. Baca, 761 F. App'x 724, 727 (9th Cir. 2019) (case involving former sheriff who led conspiracy to obstruct justice and impede federal investigation); and (3) indicia that defendants or those acting on their behalf will interfere in the judicial process, United States v. Boyajian, No. CR 09-933(A)-CAS, 2016 WL 225724 (C.D. Cal.) *6-7 (noting "[m]any courts have found it prudent to empanel an anonymous jury where there were ... allegations of witness tampering").

**B.    Reasonable Safeguards to Minimize any Prejudice**

When a court orders an anonymous jury, it must take steps to minimize any prejudice resulting from the "risk [] that jurors may infer that the dangerousness of those on trial required their anonymity, thereby implicating defendants' Fifth Amendment right to a presumption of innocence". United States v. Barragan, 871 F.3d 689, 712 (9th Cir. 2017) (cleaned up). To minimize this risk, a "court must adopt reasonable safeguards [] such as telling the jury that the reason for their anonymity is to protect their

privacy, or that anonymity is common in federal court." Id.

In this circuit, "the generally accepted practice for minimizing prejudice ... is to downplay (not accentuate) the significance of the juror anonymity procedure." United States v. Mikhel, 889 F.3d 1003, 1032 (9th Cir. 2018) (cleaned up). Courts therefore satisfy this requirement by, for example, providing "neutral justifications for the jury's anonymity . . . focused on juror confidentiality." See, e.g., id. ("district court did not instruct the jury on the reasons for their anonymity but simply informed them they would be referred to by number rather than name . . . [and] questionnaire potential jurors completed stated their information would 'be kept confidential' and that "[n]either your identities nor your answers will be released to the general public or the media'"); Fernandez, 388 F.3d at 1245 (district court appropriately "suggested that such [anonymizing] procedures are routine").

Courts can also "sufficiently safeguard[] defense counsel's ability to conduct voir dire" by providing a thorough questionnaire to potential jurors, detailing "each potential juror['s] [] age, marital status, city of residence, employment history, and education, among other things." Mikhel, 889 F.3d at 1032. As explained below, the government has agreed to collaborate with the defense to propose a questionnaire to ensure a meaningful voir dire of potential jurors.

**III. AN ANONYMOUS JURY IS APPROPRIATE AND NECESSARY TO PROTECT THE JURY'S FACT-FINDING FUNCTION AND PROTECT JUROR SAFETY**

Each of the non-exhaustive factors outlined by the Ninth Circuit compel preserving juror confidentiality by empaneling an anonymous jury in this case:

1

2

### A.    Defendants' Connection to Organized Criminality and Payments for Violence

3

The first and second factors --- defendants' involvement with

4

organized crime and the group's capacity to harm jurors --- strongly

5

weigh in favor of juror protection and anonymity.  As alleged in the

6

Second Superseding Indictment ("SSI"), defendant Banks is the leader

7

of Only the Family, or OTF.  (SSI at Introductory Allegations ¶ 1.)

8

While OTF is in part a rap group, several of its members and

9

associates have a history of extreme violence, including murder.  For

10

example, in 2024, six members of the O-Block street gang ---

11

including OTF associate Marcus Smart aka "Muwop" --- were convicted

12

of racketeering offenses that included the murder of Chicago rapper

13

Carlton Weekly aka "FBG Duck."[1]  Federal murder-for-hire charges are

14

also currently pending against two defendants who were allegedly

15

motivated to kill by OTF-linked payments.[2]  These murders, and the

16

other violent crimes committed by defendants and other prominent OTF

17

members, Farmby Decl., ¶¶ 2-8, show the compelling need for an

18

anonymous jury in this case due to the strong link between OTF and

19

organized violence.  See, e.g., United States v. Darden, 70 F.3d

20

1507, 1533 (8th Cir. 1995) (considering, among other things,

21

defendants' violent criminal history in use of affirming anonymous

22

---

23

[1] See https://www.justice.gov/usao-ndil/pr/six-members-or-
associates-violent-street-gang-convicted-federal-racketeering-

24

offenses; Declaration of Jarron Farmby ("Farmby Decl."), ¶ 8.
Historically, there has been a close connection between OTF and

25

O-Block.  Indeed, as alleged in the SSI, the primary motive for the
cross-country travel and attempt to execute T.B. is revenge for the

26

murder of OTF member Dayvon Bennett aka "King Von," who was a known
O-Block gang member.

27

[2] See https://www.justice.gov/usao-ndil/pr/two-men-charged-
murder-hire-plot-resulted-fatal-shooting-chicago; see also Dkt. 105,

28

Ex. 1 at 12 (unsealed search warrant affidavit describing shooters'
discussion of payment from OTF).

jury); <u>see also</u> <u>United State v. Williams</u>, No. CR 05-920-RSWL, 2009 WL 10659328, at *2 (C.D. Cal. Aug. 19, 2009) (empaneling an anonymous jury where defendants committed robbery and murder as members of a "violent street gang whose members and associates are suspected of multiple shootings and killings as well as other violent crimes, including but not limited to murder, robbery, bank robbery, burglary, drug trafficking, and firearms possession").

Just like the head of a typical street gang, defendant Banks exerts considerable influence over his associates, while attempting to insulate himself from their street-level criminality.  A seized audio message between two OTF associates demonstrates this hierarchy. In the message, a prominent OTF associate explains that when "people call [Banks] for money," he gives out "500, 600 thousand [] to the streets," including funding his conspirators' "sliders," --- slang for stolen cars used to commit crimes.  (Farmby Decl., ¶ 9, Ex. A (attaching audio clip); <u>see also</u> Dkt. 105, Ex. 2 [Under Seal] at 11-12 (citing and describing audio clip).)

The associate describes how Banks controls and influences their operations, that Banks "want[s] to know who in charge of what first, that's how he want shit done, he want it done right . . . he want people to get sliders and stuff like that for sure, but he want people to know what's going on so it can be a real structured situation blood not no more little boy shit."  (Farmby Decl., ¶ 9, Ex. A.)  He further details how defendant Banks' money comes with a price --- that "[t]his shit is going to get done right where people gonna get blamed for their own fuck ups."  (<u>Id.</u>)  That structure explains why defendant Banks warned an OTF associate --- as the associate purchased flights for the conspirators to travel to

1  Southern California to commit the murder at issue in this case ---

2  "Don't book no flights under no names involved wit me".  (SSI at

3  Count One, Overt Act 6).

4      The allegations in this case and evidence collected during the

5  investigation further show that defendant Banks uses his power and

6  influence over OTF to promote violence against his rivals and others

7  who stand in his way.  The SSI alleges that six hitmen --- OTF

8  members and two individuals recruited by defendant Wilson --- flew

9  across the country at the direction of defendant Banks to exact

10 revenge on his rival.  After stalking the intended victim for nearly

11 a day, three hitmen opened fire at a busy gas station in Los Angeles

12 and killed S.R.

13     But S.R.'s death is not an isolated example of defendant Banks

14 directing OTF violence.  See, e.g., Shryock, 342 F.3d at 961

15 (explaining Mexican Mafia's structure, including that "gang had

16 numerous associates who aspired to become members and were willing to

17 commit crimes on the Mexican Mafia's behalf in hopes of attaining

18 membership", quoting an associate's mantra that "If the mafia has any

19 enemies, that they're also my enemies").  He is alleged to have

20 placed additional "bounties on individuals that he and other OTF

21 members wanted to kill."  (See SSI at Count One, ¶ B.1; see also Dkt.

22 105, Ex. 2 [Under Seal] at 12-13, 18-19 (describing bounties).)[3]  And

23

24     [3] Banks has embraced his penchant for bounties in his music,
   rapping, for example, "I don't want no niggas who you catch, **I want**
25 **the one I paid for** ... Trollin' ass, **we shot your homie.**" "Gucci Mane
   – Rumors feat. Lil Durk [Official Video]", available at
26 https://www.youtube.com/watch?v=QVn1DGgqBNo (emphasis added); see
   also "Scoom his Ass (ft. Boonie Moe) (Official Video)", available at
27 https://www.youtube.com/watch?v=HXUDCW4wECY ("Popping traffic, we in
   Cali', ride through Beverly Hills with choppers ... dying to see the
28 oppas"; "Bounty hunter, he ready to crack that lil' bitch down to get
   *(footnote cont'd on next page)*

8

in yet another federal murder-for-hire case in Chicago involving the death of S.M., Banks was alleged to have "offer[ed] money for people to kill those responsible for his brother's murder, and more specifically, offering to pay money for any Gangster Disciple that is killed." (Dkt. 105, Ex. 1 at 12.)  Indeed, just two weeks following the murder of S.M. --- the suspected leader of a faction of Gangster Disciples (id. at 8) --- the alleged shooters discussed payment from OTF and defendant Banks.  (Id. at 25-26 (alleged shooter texting another alleged shooter, "Wassup with otf . . . Wym they not paying . . . Did durk gave u that money".)

Moreover, defendant Banks has threatened to unleash his OTF associates to stalk and "hunt" his rivals.  For example, in a seized text message thread between defendant Banks and other OTF associates (including defendant Wilson), Banks boasts about threatening a rival, telling him: "**I got them** hunting you up ads better have 3ski mask on."  (Dkt. 105, Ex. 2 [Under Seal] at 12 (emphasis added).)  And in a similar thread, defendant Banks and his OTF associates discuss defendant Banks' heated exchange with another rival, with defendant Banks telling his associates: "I'm finna pipe it up," i.e., a common street reference to the use of a firearm.  (Id.)  In response, an OTF associate agreed to follow defendant Banks' lead, exclaiming: "Blood it's green [emoji of car and traffic light] getting shit together now no phones," referring to a "green light" to act on defendant Banks' wishes for violence.

The above-described structure of the criminal side of OTF ---

---

her off"). Although "Scoom his Ass" does not appear to have been officially released by defendant, the lyrics are authentic as the government seized the audio file from a co-conspirator's cellular phone pursuant to a federal search warrant. See Bates Media 638.

defendant Banks' funding and considerable wealth, the power and
control he exerts over his associates, his desire to seek revenge on
those who cross him and his associates' willingness to do what they
are told --- all show the need for an anonymous jury in this case.

### B.    Significant Risk of Interference with Witnesses and the Judicial Process

Defendant Banks has repeatedly shown his disdain for the
judicial process and witnesses who may cooperate with the government.
It is therefore not surprising that witness interference has already
occurred and is likely to continue in this case.  Such interference
weighs strongly in favor of jury anonymity.  See, e.g., United States
v. Boyajian, No. CR09-933(A)-CAS, 2016 WL 225724, at *6 (C.D. Cal.
Jan. 19, 2016) (empaneling anonymous jury where defendant in a prior
case persuaded minor victim not to testify and threatened victim's
family member).

Banks has made clear his contempt for cooperating witnesses.  On
a popular podcast that currently has over 1 million views, Banks
exclaimed "**I hate all rats**."  He elaborated:

> "If you ever told, if you ever tell, I hate you. Like,
> with a passion ... That made me who I am today. That
> took away half of my life. Motherfucker telling on my
> pops ... So I really hate rats with a real passion.
> Like, I hate you. Bad. I'm looking to the camera. I hate
> fucking rats."[4]

Given Banks' vocal scorn for those who may cooperate with the
judicial process, it is predictable that suspected witnesses in this
case have already been subject to threats and intimidation.  See,

---

[4] See DJ Akademiks, LIL Durk Realest Interview Ever. Last
Interview on Off The Record w/ Akademiks, *available at*
https://www.youtube.com/watch?v=b92PfcokiYI (49:50-50:27).

10

e.g., Shryock, 342 F.3d at 972 (explaining that "members of the
Mexican Mafia maintained a 'code of silence' obligating members
testifying in court to deny the existence of and membership in the
Mexican Mafia"); United States v. Krout, 66 F.3d 1420, 1427-28 (5th
Cir. 1995) (one of defendants' group's tenets was to murder or
attempt to murder members suspecting of informing authorities).  To
start, one of Banks' trusted OTF associates has already threatened a
suspected government witness.  Specifically, the OTF associate told
the witness's family member that the suspected witness was a
"snitch", a "snake", and was "not for the family" --- an undoubted
reference to Banks' Only the Family.  (Dkt. 105, Ex. 2 [Under Seal]
at 18-19.)  Such threats to witnesses, even when committed by a
defendant's associates, are precisely the type of conduct that
justify enhanced juror safety and procedures to ensure the jury can
fulfil its duties without improper outside influence.  See, e.g.,
United States v. Bowman, 302 F.3d 1228, 1238-39 (11th Cir.
2002) (upholding use of anonymous jury when defendant was the leader
of a motorcycle gang with history of violence and witness
intimidation); United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir.
1995) (same where defendants had sought to bribe and threaten
witnesses and had attempted to influence a witness in a prior state
case).

1  ████████████████████████████████████████████████

2  ██████████████████████████████████████

3      The witness intimidation in this case is not limited to

4  clandestine communications. ██████████████████████████████

5  ███████████████████████████████████████████████████

6  ████████████████████████████████████[5] █████████████

7  ███████████████████████████████████████

8  ███████████████.[6] █████████████████████████████████

9  ███████████████████████████████████████████

10 ████████████.[7]

11     The public speculation about potential witnesses has already had

12 significant consequences, ███████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ██████████████████████████████████████[8] Such

16 public mention of reprisal against suspected witnesses shows the

17 reasonable inference that a juror may "fear that their identities

18 could be disclosed online, exposing them to threats from individuals

19 who are not directly associated with Defendant." United States v.

20 _____

21     [5] See Farmby Decl., ¶ 11.

22     [6] ████████████████████████████████████████████████

23 ████████████████████████     ████████████████████████

24 ████████████████████████████████

25     [7] █████████████████████████████████████

26 █████████████████████████████████████████████

27     [8] ████████████████████████████████████████████

28 ████████████████████████████████████████████

                          12

*Asainov*, 618 F. Supp. 3d 105, 117 (E.D.N.Y. 2022) (cleaned up); see
also United States v. Edmond, 52 F.3d 1080, 1092 (D.C. Cir. 1995)
(cleaned up) ("As a practical matter, we cannot expect jurors to
'take their chances' on what might happen to them as a result of a
guilty verdict.").

Defendant Banks has also shown a repeated disrespect and
willingness to impede the judicial process.  Despite admonishments
from two courts about phone violations at the Los Angeles MDC,
defendant Banks has escalated his defiance of BOP rules that keep
witnesses and others safe.  In late August 2025, BOP officials seized
an Apple Watch with cellular capability from defendant.  (See Farmby
Decl., ¶ 12, Ex. B [Under Seal].)  Even more troubling is Banks'
conduct after he was caught.  Rather than accept responsibility for
this violation, defendant allegedly obstructed the investigation
attempting to damage and/or destroy the communications device.  See
id.; see also United States v. Ashburn, No. 13-CR-0303 NGG, 2014 WL
5800280, at *8 (E.D.N.Y. Nov. 7, 2014)(explaining that defendant's
"disrespect, if not outright contempt, for the processes by which the
charges against him will be resolved, surely strengthens the case for
empaneling an anonymous jury" where defendant refused to permit
officials to execute DNA warrant and engaged in inappropriate
courtroom behavior); Asainov, 618 F. Supp. 3d at 117 (defendant's
interference with judicial process, including destroying his cell
phone to prevent recovery of evidence, weighed in favor of anonymous
jury).  Defendant Banks' flouting of the rules is all-the-more
concerning here, given the previous judicial admonishments and the
nature of his latest offense: possession and destruction of a device
that could be used to have unmonitored communication with witnesses

13

or those who may intimidate witnesses or take steps to alter their testimony.  Indeed, although the government continues to investigate Banks' possession and use of the communications device, initial data associated with the serial number of the watch shows that the device was purchased on May 26, 2025, and was activated the next day.  (See Farmby Decl., ¶ 12.)

### C. Potential that the Defendants' Will Suffer a Lengthy Incarceration if Convicted

As all defendants face a mandatory life sentence should they be convicted of 18 U.S.C. § 1958, "the potential that the defendants will suffer a lengthy incarceration if convicted" clearly weighs in favor of an anonymous jury.  Shryock, 342 F.3d at 971; United States v. DeLuca, 137 F.3d 24, 32 (1st Cir. 1998) (potential mandatory life sentence "surely provided a strong inducement to resort to extreme measures in any effort to influence the outcome of the trial")

### D. The Extensive and Continuous National Publicity In This Case Further Requires Juror Anonymity

Finally, the likelihood of extensive publicity and the risk that jurors' names will become public is substantial here.  Indeed, in Shryock, the mere possibility of media attention was sufficient for the Ninth Circuit to find that this factor was met.  342 F.3d at 972 (the trial "could expect to receive extensive publicity").

This case has attracted significant media attention since defendants were arrested, and the coverage will unquestionably increase as the trial date approaches.  National news has extensively

1   covered each step of the case, including defendants' arrest[9],

2   defendant Banks' detention hearings[10], and even routine and mundane

3   filings like the latest stipulation to continue the trial[11].  The case

4   has also received substantial attention on social media, including

5   in-depth analysis of the case by legal channels.[12]  Defendant Banks

6   has also chosen to further publicize the case by having defense

7   counsel participate in interviews,[13] and by using defendant Banks'

8   social media account (with over 15 million followers) to falsely

9   claim the government is using this murder case to "criminalize[]"

---

13   [9] See, e.g., LA Times, "Grammy winner Lil Durk charged in
murder-for-hire plot near Beverly Center Mall," available at
14   https://www.latimes.com/california/story/2024-10-25/grammy-winner-
lil-durk-florida-murder-for-hire-charges (October 25, 2024); NY
15   Times, "Lil Durk Is Accused of Conspiring to Kill a Rival. What We
Know About the Case," available at
16   https://www.nytimes.com/2024/10/26/arts/music/lil-dirk-murder-for-
hire-arrest.html (October 26, 2024).

17       [10] See, e.g., Chicago Tribune, "Federal prosecutors link Lil Durk
to 2022 Chicago killing as rapper is denied bond in LA," available at
18   https://www.chicagotribune.com/2024/12/12/lil-durk-denied-bond/
(December 13, 2024); LA Times, "Judge denies Lil Durk bail in murder-
19   for-hire case, citing rapper's calls from jail," available at
https://www.latimes.com/california/story/2025-05-08/judge-denies-lil-
20   durk-bail (May 8, 2025); Rolling Stone, "Lil Durk Denied Bail Again
in Murder-for-Hire Case," available at
21   https://www.rollingstone.com/music/music-news/lil-durk-denied-bail-
murder-for-hire-case-1235352544/ (June 9, 2025).

22       [11] See, e.g., Billboard, "Lil Durk's Murder-for-Hire Trial Could
23   Be Delayed Until 2026," available at
https://www.billboard.com/pro/lil-durk-murder-for-hire-trial-could-
24   be-delayed-2026/ (Sept. 12, 2025).

25       [12] See, e.g., Law & Crime Network, "5 Big Updates in Rapper Lil
Durk's Murder-for-Hire Case", available at
26   https://www.youtube.com/watch?v=BS-MlLsOmKw (approximately 380,000
views as of Oct. 6, 2025).

27       [13] See, e.g., DJ Vlad, "Lil Durk's Lawyer Drew Findling Breaks
Down His Murder-for-Hire Fed Case", available at
28   https://www.youtube.com/watch?v=NZQN2pC7nCQ (approximately 240,000
views).

defendant for his "creativity" and "art."[14]  Such extensive coverage, understandably underscored by defendant's notoriety and the premeditated murder at issue in this case, heavily weighs in favor of additional judicial safeguards to protect the jury and preserve the integrity of the trial.  See, e.g., United States v. Baca, 761 F. App'x 724, 727 (9th Cir. 2019) ("anonymous jury was reasonable in light of the highly publicized nature of this case, Baca's and his co-conspirator's positions as former high-ranking law enforcement officers, and the nature of the charges at issue").

The risk that defendants, affiliates, and/or supporters will attempt to improperly influence or intimidate the jury are not speculative.  To date, defendants' supporters have already attempted to intimidate individuals connected to this case.  For example, a United States Magistrate Judge received multiple voicemails from an individual stating, among other things, that defendant Banks and Wilson were innocent and that "if they get life . . . I'm gonna burn this motherfucker down . . . burn it to the ground . . . it's not a game bitch".  (See Farmby Decl., ¶ 13.)  Another supporter issued a similar threat to a prosecutor, stating "free Durk" or be shot.  (See id., ¶ 14.)[15]  The extensive and continuous publicity, coupled with the threats and the other attempts to impact witness testimony discussed above, demonstrate the need for juror anonymity to ensure

---

[14] See, e.g., Instagram, @lildurk, https://www.instagram.com/reel/DJCr4YEzTrA/?hl=en (post on April 29, 2025).

[15] The government's investigation into these threats uncovered no direct link to defendants.  However, the pattern of threats from supporters only underscores the risk to jurors by those outside the control of the Court.

juror safety and preserve their ability to discharge their constitutional duties without fear of reprisal.

**E. Reasonable Precautions Can Safeguard Defendants' Right to a Fair Trial, While Still Protecting the Judicial Process**

Because jury anonymity is warranted here, the government requests that the Court implement well-established safeguards to ensure that the fundamental rights of the defendants are not violated. See Fernandez, 388 F.3d at 1244. Specifically, this Court can minimize any risk of prejudice by downplaying juror anonymity, and "not instruct[ing] the jury on the reasons for their anonymity but simply inform[] them they would be referred to by number rather than name." Mikhel, 889 F.3d at 1032 (cleaned up); see also id. (court provided juror questionnaire that stated their information would "be kept confidential" and that "[n]either your identities nor your answers will be released to the general public or the media").[16]

Additionally, the government has agreed to collaborate with the defense to craft a thorough jury questionnaire, which will ensure the parties can meaningfully conduct effective voir dire. As explained in Mikhel, a district court "sufficiently safeguard[s] defense

---

[16] The Court can also provide "neutral justifications for the jury's anonymity . . . focused on juror confidentiality." See, e.g., Fernandez, 388 F.3d at 1245 ("neutral justifications for the jury's anonymity . . . focused on juror confidentiality" and which "suggested that such procedures are routine" were proper safeguards to employ in order to minimize any risk of infringement upon the fundamental rights of defendants where an anonymous jury was empaneled); Shryock, 342 F.3d at 972-73 (appropriate safeguard employed where the jurors were instructed that anonymity was commonplace and was used to protect their privacy from curiosity-seekers, and where the jurors were also informed that "use of such jury had nothing to do with the [defendants'] guilt or innocence"); Darden, 70 F.3d at 1530 (defendant's rights protected where jurors were told that anonymity would enable the jurors to avoid harassment from the media).

counsel's ability to conduct voir dire by providing defendants with a[] questionnaire for each potential juror detailing age, marital status, city of residence, employment history, and education, among other things.  None of our cases require, or even suggest, that providing potential jurors' names and addresses to defense counsel is necessary in circumstances such as these."  889 F.3d at 1032. Accordingly, by way of a jury questionnaire and oral questioning (both en masse and individually), this Court can ensure that the defendants have sufficient information to enable them to make challenges for cause and to intelligently use their peremptory challenges.  See, e.g., United States v. Childress, 58 F.3d 693, 704 (D.C. Cir. 1995) (noting the use of an "extensive questionnaire" in affirming the use of an anonymous jury).

## IV.   CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court empanel an anonymous jury to protect the prospective jurors and prevent any interference with the judicial process. Specifically, the government requests that the names, addresses, and specific places of employment not be revealed to either party.