1  DREW FINDLING
   MARISSA GOLDBERG
2  The Findling Law Firm PC
   3575 Piedmont Road
3  NE Tower 15, Suite 1010
   Atlanta, GA 30305
4  Telephone: (404) 460-4500
   Email: drew@findlinglawfirm.com
5          marissa@findlinglawfirm.com

6  JONATHAN M. BRAYMAN
   Breen & Pugh
7  53 W. Jackson Blvd., Suite 1550
   Chicago, IL 60604
8  Telephone: (312) 360-1001
   Email: jbrayman@breenpughlaw.com

9  CHRISTY O'CONNOR (Bar No. 250350)
10 The Law Office of Christy O'Connor
   360 East 2nd Street, Suite 800
11 Los Angeles, California 90012
   Telephone: (323) 716-5959
12 Email: christy@christyoconnorlaw.com

13 Attorneys for Defendant
   DURK BANKS
14

15            **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**

16 UNITED STATES,                    Case No. 2:24-cr-00621-MWF

17            Plaintiff,             **NOTICE OF JOINT MOTION AND**
                                     **JOINT MOTION TO DISQUALIFY;**
18      v.                           **DISMISS INDICTMENT; VACATE**
                                     **SCHEDULING ORDER; REOPEN**
19 DURK BANKS et al.,                **PRETRIAL HEARINGS; AND FOR**
                                     **AN EVIDENTIARY HEARING,**
20            Defendants.            **BASED ON FIFTH AND SIXTH**
                                     **AMENDMENT VIOLATIONS**
21
                                     Date:       TBD[1]
22                                   Time:       TBD
                                     Courtroom:  TBD
23

24      Defendants Durk Banks, Deandre Dontrell Wilson, David Brian Lindsey, and Asa

25 Houston, by and through their respective counsel, hereby file this Joint Motion to

26

27 _____

28 [1] Defendants request that this Court refer this Joint Motion to another judge, namely the Chief Judge of
   the Central District of California, and then to an "out-of-district or out-of-circuit jurist," following the
   procedure previously employed in *United States v. Steward*, No. 2:06-cr-864-MRH, Dkt. 51 (C.D. Cal.
   Jan. 22, 2007) (Stotler, C.J.) ("To avoid appearance of partiality, the Court orders the Central District
   bench recused, the Court to obtain out-of-district or out-of-circuit jurist."); Dkt. 47 (referring case to
   Chief Judge since Defendant's motion sought recusal of all judges of C.D. Cal. bench).

disqualify all Judges of the United States District Court for the Central District of California under 28 U.S.C. § 455(a), disqualify the United States Attorney's Office for the Central District of California, dismiss the Second Superseding Indictment with prejudice, vacate the scheduling order contained in Dkt. 220 ¶ 6, reopen pretrial hearings, and for an evidentiary hearing, based on violations of Defendants' Fifth and Sixth Amendment rights.

Defendants request that the Court follow the same procedure that the late Judge Manuel L. Real implemented in *United States v. Steward*, No. 2:06-cr-00864-MRH, when presented with a similar motion. *Id*., Dkt. 47 (upon receiving defendant's "motion to recuse the entire court," Judge Real referred the matter to the Chief Judge). *Id*.; *see also* Dkt. No. 52 (Ninth Circuit's order, under 28 U.S.C. § 292(B), designating district judge from District of Oregon to temporarily perform the duties of district judge for the Central District of California for the specific case of *United States v. Steward*).

This Joint Motion is based on the attached memorandum and exhibits, the files and records in this case, and any other evidence or argument that the Court may permit.

Respectfully submitted,

BY:  /s/ *Jonathan M. Brayman*          /s/ *Shaffy Moel*

    /s/ *Drew Findling*          Attorney for Asa Houston

    /s/ *Marissa Goldberg*          /s/ *Craig A. Harbaugh*

    /s/ *Christy O'Connor*          Attorney Deandre Dontrell Wilson

    Attorneys for Durk Banks          /s/ *Tillet J. Mills II*

                        Attorney for David Brian Lindsey

1

**<u>NOTICE OF MOTION</u>**

2

      Defendants Durk Banks, Deandre Dontrell Wilson, David Brian Lindsey, and Asa

3

Houston, by their respective undersigned counsel, hereby submit this Joint Motion to

4

Disqualify Under 28 U.S.C. § 455; Dismiss Indictment; Vacate Scheduling Order;

5

Reopen Pretrial Hearings; And for An Evidentiary Hearing. Pursuant to the local rules,

6

the parties met and conferred on November 12, 2025, during which counsel for the

7

government indicated that they opposed this motion. The government requests until

8

December 1, 2025 to respond to this Joint Motion, whereafter the defendants request

9

until December 8, 2025 to reply. The parties request that the Court refer this matter to an

10

out-of-district judge for hearing as soon as is practicable.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION .................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................... 2

    A.    Threats Directed at Magistrate Judge Donahue and Courthouse Personnel ...................................................................................... 4

    B.    The Government's Immediate Awareness and Proactive Investigation into the February 22, 2025 Death Threats Received by Judge Donahue ............................................................................. 4

    C.    Additional Threats Against AUSA Yanniello and Courthouse/USAO Personnel ...................................................... 5

    D.    Continued Litigation Before Threatened Judges Without Disclosure ................................................................................... 7

    E.    The Government's Selective, Limited, and Untimely Disclosures, Followed by Defense Demands for Full Information ...................... 9

III.  ARGUMENT ......................................................................................... 10

    A.    Legal Standards Governing Disqualification and Recusal ................. 10

        1.    Standard for Judicial Recusal ..................................................... 10

        2.    Standard for Prosecutorial Disqualification ............................. 11

    B.    The Threats and *Ex Parte* Communications Require Recusal of the Central District of California Bench ............................................ 11

        1.    The Appearance of Partiality is Sufficient Under § 455(a)............ 11

    C.    The Government's Failure to Disclose the Threats and Resulting Criminal Investigations Requires Disqualification of the USAO-CDCA.......................................................................................... 16

    D.    The Combined Misconduct Violates Due Process and Warrants Dismissal............................................................................................ 18

        1.    The Structural Nature of the Violation.......................................... 18

        2.    The Government's Conduct Was Outrageous and Prejudicial........ 19

        3.    Lesser Remedies Cannot Cure the Prejudice ................................ 19

    E.    Alterative Relief; In Camera Review; Evidentiary Hearing; and Reopening Pretrial Hearings. ............................................................. 19

IV.   CONCLUSION ...................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Fulminante*, 499 U.S. 279 (1991) ................................................................. 19

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) ........................................ 11, 18

*In re Nettles*, 394 F. 1001 (7th Cir. 2005) ............................................................. 15, 16

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988)........................ 10, 12

*Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995) ..................................................... 12, 15

*Tumey v. Ohio*, 273 U.S. 510 (1927)............................................................................ 10

*United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008) ......................................... 19

*United States v. Cooley*, 1 F.3d 985 (10th Cir. 1993) ........................................... 12, 15

*United States v. Greenspan*, 26 F.3d 1001 (10th Cir. 1994)................................... 12, 14

*United States v. Holland*, 519 F.3d 909 (9th Cir. 2008) ...................... 10, 12, 13, 14, 15

*United States v. Kojayan*, 8 F.3d 1315 (9th Cir. 1993)............................................... 19

*United States v. Sibla*, 624 F.2d 864 (9th Cir. 1980......................................................... 11

*United States v. Williams*, 68 F.4th 564 (9th Cir. 2023) .................................. 11, 17, 18

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003)............................................... 12, 14

*Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987).............................. 11, 16

**Statutes**

28 U.S.C. § 144 ....................................................................................................... 10, 11

28 U.S.C. § 455 ............................................. 10, 11, 12, 13, 14, 15,  16, 17, 22

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.    INTRODUCTION

For more than seven months, the prosecution team concealed from defendants that both the presiding magistrate judge and lead trial prosecutor had received violent, case-specific death threats made while invoking the names of Durk Banks and Deandre Wilson. This prolonged nondisclosure—compounded by undisclosed *ex parte* communications between the prosecution team and the bench about these threats—has irreparably compromised the structural integrity of these proceedings.

By February 25, 2025 at the latest, the government and district court knew that Magistrate Judge Patricia Donahue had received four explicit voicemails threatening her life and courthouse personnel. On April 28, 2025, lead prosecutor AUSA Ian Yanniello received similar death threats directed at him and all courthouse staff. The United States Attorney's Office, in carrying out a secret investigation, relayed the threats to all judges in the Central District of California, including this Court.  Yet defendants learned nothing of these threats until October 1, 2025—after months of litigation before judges who knew of the threats, but remained silent, and just days before pretrial motions were due.

Threats of violence against judges and prosecutors strike at the heart of our constitutional order. When individuals seek to intimidate those administering justice, they attack not just individuals but the rule of law itself. The undersigned and their clients unequivocally denounce these reprehensible threats against Judge Donahue, AUSA Yanniello, and courthouse personnel.

The government's response to these threats, however—concealing them while continuing to prosecute defendants before judges who were themselves intended targets —violated fundamental constitutional guarantees. The prosecution's seven-month silence deprived defendants of their Fifth and Sixth Amendment rights to due process and an impartial tribunal. During this period, defendants unknowingly litigated critical

matters, including detention proceedings and pretrial motions, before judicial officers operating under the cloud of undisclosed threats.

This concealment prevented defendants from seeking recusal, challenging the fairness of proceedings, or making informed strategic decisions. The resulting appearance of partiality—amplified by *ex parte* discussions between the bench and prosecution about threats directly implicating defendants—has created an incurable breach of judicial neutrality that no lesser remedy than full recusal of the Central District bench can cure.

The integrity of criminal prosecutions depends on transparency and impartiality. Here, both were fatally compromised. Because these violations strike at the core of due process and the constitutional guarantee of receiving fair hearings in front of an impartial decision-maker, dismissal is the only adequate remedy. Additionally, the line prosecutors, especially AUSA Yanniello must be barred from participating in the prosecution of this case.  And because it appears the entire United States Attorney's Office for the Central District of California (USAO-CDCA) participated in the investigation, the entire office must be disqualified.   Finally, given that the USAO sought a superseding indictment against the defendants, just days after being directly threatened in their name, the indictment must be dismissed.  The fact that USAO concealed the information and only revealed it to support its extraordinary motion to empanel an anonymous jury, demands that the indictment be dismissed with prejudice.

No lesser sanctions can restore public confidence in the fairness of this prosecution or cure the prejudice flowing from months of secret communications and judicial proceedings conducted under these extraordinary circumstances.

## II.    FACTUAL BACKGROUND

By at least February 25, 2025, the prosecution team—including the lead FBI Case Agent, Sarah Corcoran, and the USAO—knew that Judge Donahue had received violent threats connected to this case. By April 28, 2025, they also knew that AUSA Yanniello

and courthouse/USAO personnel had been similarly threatened. Yet the government did not disclose any of this to the defense until October 1, 2025.

As more fully detailed in the paragraphs below, the most relevant dates to this Joint Motion are as follows:

- **February 22, 2025** – Four threatening voicemails to Judge Donahue referencing Mr. Banks and threatening Judge Donahue and courthouse personnel.

- **February 25, 2025** – USMS contacts chambers and USAO; FBI opens investigation; SA Corcoran becomes FBI point of contact and actively investigates threats.

- **April 28, 2025** – Threatening call to AUSA Yanniello with death threats to AUSA Yanniello and courthouse/USAO personnel.

- **May 1, 2025** – the United States Attorney's Office obtained a second superseding indictment in this case. Dkt. 147.

- **May 8, 2025** – Detention hearing before Judge Donahue; threats still undisclosed to defense.

- **June 2, 2025** – Detention hearing and pretrial motion hearing on Defendants' motion to disclose grand jury transcripts before Judge Fitzgerald; threats still undisclosed to defense; continued detention ordered; ruling pending on motion to disclose.

- **August 6 and 13, 2025** – Conferences between prosecution team and undersigned defense counsel re: anonymous jury; threats still undisclosed.

- **October 1, 2025** – First partial disclosure of threats by the government; defense makes oral demands for immediate disclosure of all relevant materials and communications about threats.

3

- **October 9 and 14, 2025** – Defense written discovery demand letters.
- **October 23, 2025** – Government's letter and selective disclosures about threats.

### A.    Threats Directed at Magistrate Judge Donahue and Courthouse Personnel

On February 22, 2025, a male caller left four violent voicemails for Magistrate Judge Patricia Donahue on her work line. *See* Exhibit (Exh.) 1, Declaration of Jonathan M. Brayman. The messages referenced Mr. Banks and Mr. Wilson by name, contained explicit death threats, and invoked acts of mass destruction accompanied by sounds mimicking gunfire. *See* Exh. 2, Special Agent Corcoran's FBI FD-1057 (detailing death threats received by Judge Donahue left on her work voicemail on February 22, 2025) (filed under seal); Exh. 3, Transcribed February 22, 2025 Death Threats Voicemails (filed under seal). For example, one message warned: "If they get life, I'm going to burn this [expletive] down. I'm talking 'bout the world, and I'm going to burn it, burn it to the ground." *Id*. On the voicemails, the caller urges Judge Donahue repeatedly to "do the right thing" and to "free" Mr. Banks and Mr. Wilson. *Id*.

### B.    The Government's Immediate Awareness and Proactive Investigation into the February 22, 2025 Death Threats Received by Judge Donahue

By February 25, 2025, the United States Marshals Service ("USMS") had contacted Judge Donahue's chambers and the USAO regarding the threats. *See* Group Exh. 4, Reports and Emails Between Prosecution Team, USMS, and the Judiciary (filed under seal). The FBI opened a criminal investigation and assigned Special Agent Sarah Corcoran, the lead case agent on the Banks prosecution, as the primary point of contact. Exhs. 2 and 4. Corcoran drafted the FBI FD-1057 report describing the voicemails and was listed as the contact person for the investigation. *Id*.

Agent Corcoran and the USAO coordinated investigative steps—including full workups on the suspected caller, cross-checks of jail and call records, and

communication with other field offices. *Id*. She also arranged for the FBI to interview the suspected caller and reported the results to the AUSAs and USMS. Exh. 4, Reports and Emails Between Prosecution Team, USMS, and the Judiciary (filed under seal). Thus, by late February 2025, both the prosecution team and the bench were aware that the magistrate judge presiding over the case was a named victim of violent, case-specific threats.

### C.    Additional Threats Against AUSA Yanniello and Courthouse/USAO Personnel

On April 28, 2025, a separate caller telephoned AUSA Ian Yanniello at the USAO, issuing explicit death threats against him, as well as everyone who worked at the courthouses and the USAO.[2] *See* Exh. 5, Special Agent Jordan Guyton's FBI FD-1057 (detailing death threats received by AUSA Yanniello at the USAO via telephone). Agent Guyton's FBI report is dated approximately two full weeks after the threatening phone call that AUSA Yanniello received. Because it was not produced in the discovery produced by the government on this issue, it is unknown to the defense what reason explains this delay. Nor does the defense have any information about what happened immediately after AUSA Yanniello received the phone call. Many questions remain unanswered from the government's discovery production.

For example, did AUSA Yanniello first call his supervisor? Did he call Agent Corcoran? Who took the initial report? Did the agents listen to the recorded call? Has it been preserved? Did AUSA Yanniello have communication with the Court right away? Who did he talk to? What did he say, if anything, about the phone call's relationship to the defendants. The discovery produced shows that that the prosecution team, and the

---

[2] Despite defense requests, the government has still not produced the recording of the April 28, 2025 phone call, wherein the caller made death threats to AUSA Yanniello and to courthouse/USAO personnel. The defense requests an evidentiary hearing in order to make a full and accurate factual record.

lead case agent, FBI Special Agent Sarah J. Corcoran, played an active role in the investigation into the death threats received by AUSA Yanniello. *See* Exh. 4, Reports and Emails Between Prosecution Team, USMS, and the Judiciary (filed under seal).

And perhaps most critically, an evidentiary hearing could answer how it is that the grand jury returned a second superseding indictment charging an entirely new charge—Stalking Resulting in Death in violation of 18 U.S.C. §§ 2261A(2)(A),(B), 2261(b)(1)—three days after the lead prosecutor's life was threatened by people purportedly seeking to "free" the lead defendant. Did the threatened telephone call to AUSA Yanniello have any impact on the government's seeking additional charges? Did the threatening phone calls to Judge Donahue have any impact on the government's efforts to further indict? What, if any, of this was shared in ex-parte communications between the Court and the government? The discovery leaves these questions unanswered. And because the defense and public were kept in the dark about the threats investigations and any potential impact it may have had on the bench's impartiality, the Court should order further inquiry.

The FBI later determined that the caller was a different individual than the one who called Judge Donahue and made death threats, and that a "full investigation" was opened pursuant to Section 7.5 of the FBI's Domestic Investigations and Operations Guide, citing potential violations of 18 U.S.C. § 875(c). This was to be the second full criminal investigation opened by the FBI regarding threats the bench and government received related to the instant prosecution. Both call incidents were referred for criminal investigation. The FBI investigation into the death threats received by Judge Donahue had an FBI Case ID Number of 89B-LA-4045113, and the FBI investigation into the death threats received by AUSA Yanniello had an FBI Case ID No. 9E-LA-4074487.

Moreover, the prosecution team, through Case Agent Corcoran, initiated investigations, into both sets of threats, by the FBI's Joint Terrorism Task Force and the

FBI's "Guardian Squad." *See* Exh. 6, Special Agent Corcoran's FBI Guardian Complaint Form 71 for Judge Donahue Threats Investigation (filed under seal); Exh. 7, Special Agent Corcoran's FBI Guardian Complaint Form 71 for AUSA Yanniello Threats Investigation (filed under seal). Both threats investigations had their own Guardian Case Numbers, within the FBI's terrorism-threat tracking system as well— eGuardian Case No. 1193490_LA for the death threats received by Judge Donahue and eGuardian Case No. 1216064_LA for the death threats received by AUSA Yanniello.

### D.    Continued Litigation Before Threatened Judges Without Disclosure

Despite this knowledge, the government did not disclose the threats to the defense while the case proceeded before the very judges implicated. Judge Donahue presided over Mr. Banks' May 8, 2025 detention hearing—months after receiving the threats. At that hearing, Judge Donahue heard evidence from Mr. Banks, considered the arguments and counter-evidence presented by the government, and ultimately denied Mr. Banks' pre-trial release from custody on the grounds that he was both a risk of flight and, more salient for purposes of this motion, a danger to the community. *See* Dkt. 157 (05-08-2025 Minute Entry Denying Mr. Banks' Application for Review/Reconsideration of Detention Order); Dkt. 163 (05-20-2025 Judge Donahue's Written Order Denying Reconsideration of Detention Order).

To state the obvious, Judge Donahue was in no position to consider whether Mr. Banks was too dangerous to be released while having been both personally threatened by someone purporting to act on Mr. Banks' behalf, and having had her entire workplace physically and violently threatened by the same. And not once did she reveal this potential for partiality and conflict to the defense or put the matter on the record for the good of the public's faith in the impartiality of the proceedings in any way. And the discovery fails to elucidate why this is so, further necessitating an evidentiary hearing as to *ex parte* communications between and among the bench and the prosecution team leading to this unusual outcome. As the Court is aware, Judge Donahue denied Mr.

Banks' bail request on May 8, 2025. Mr. Banks then appealed Judge Donahue's detention order to Judge Fitzgerald. Dkt. 159, 160, 162. The government filed an opposition to Mr. Banks' appeal of the detention order. Dkt. 167. On June 2, 2025, Mr. Banks and Mr. Wilson appeared before Judge Fitzgerald at a hearing on the appeal of the magistrate judge's detention order and on their motion to produce grand jury transcripts. Neither before, during or after that hearing did Judge Fitzgerald disclose that he was aware of the threats investigations against his colleague, his courthouse, or counsel for the government. And because he did not make that disclosure, Judge Fitzgerald did not assure Mr. Banks or the public that those pending investigations and *ex parte* communications had any bearing on his view of Mr. Banks' standing in the case, his requests for release, or any future proceedings before him. Rather, on June 9, 2025, Judge Fitzgerald simply denied Mr. Banks' appeal of magistrate judge's detention order. Dkt. 202 at 4 ("the magistrate judge correctly determined that clear and convincing evidence supports the finding of danger" and "[a]s the Magistrate Judge concluded, 'Defendant uses his money, influence and power to endanger individuals whom he perceives as a threat'") (citing to Dkt. 163).

Throughout the spring and summer of 2025, the parties engaged in extensive pretrial litigation and trial preparation, including discovery disputes and conferences about the government's intention to seek an anonymous jury. During the August 6 and 13 meet-and-confers, the government invoked generalized "safety concerns," but again failed to reveal the death threats and the existence of criminal investigations into the threats against the presiding judiciary and the prosecution team. Remarkably, during the August 13 meet and confer, in response to defense counsel's inquiry whether the government's request to empanel an anonymous jury was the result of a particularized concern for safety in this case, AUSA Yanniello who had himself been the target of a violent threat purportedly made in relation or on behalf of Mr. Banks—responded that he was "confused" by defense counsel's question given the obvious safety risks

associated with the violent nature of the charges in the pending prosecution. Never in the August 13 phone call did AUSA Yanniello or his colleagues disclose the existence of the threats or the pending criminal investigations into the threats.  This is especially egregious when just weeks earlier, the AUSAs on the case requested that the defense enter into a stipulation waiving any efforts to recuse Judge Fitzgerald given his brother's employment at the US Attorney's office during the pendency of this case. That the government would seek to extract a recusal waiver on a de minimis issue of judicial neutrality while concealing the existence of the threat investigation and the possible effect on the bench is deeply troubling.

**E.    The Government's Selective, Limited, and Untimely Disclosures, Followed by Defense Demands for Full Information**

Only on October 1, 2025, just days before the deadline for filing pretrial motions, did the prosecution partially disclose that Judge Donahue and AUSA Yanniello had been the victims of threats "regarding this case." Defense counsel—for Banks, Wilson, Lindsey, and Houston—immediately demanded complete disclosure of all related communications, investigative reports, and correspondence between the USAO, FBI, USMS, and the bench.

On October 9 and 14, the defense memorialized those demands in writing. *See* Group Exh. 1, Declaration of Jonathan M. Brayman. The USAO responded on October 23 with its own letter. *Id*. The government's October 23 letter completely ignores or minimizes several important events, including: (1) the May 8, 2025 detention hearing in front of Judge Donahue; and (2) *ex parte* communications between the prosecution team and the Court, which defense expressed concern about in the October 9 and 14, 2025 letters. The government implies, through their telling omission of the May 2025 hearing, that Judge Donahue had no connection to Mr. Banks' case after she held the original December 2024 detention hearing, despite the objective reality that she presided over a substantive hearing and issued rulings on May 8 and May 20, 2025,

9

ordering that Mr. Banks remain in jail prior to his trial. The government's October 23
letter also disputed that the threats endangered "everyone who worked at the courthouse
and USAO," even though the threats explicitly mentioned mass destruction—not solely
targeting Judge Donahue and AUSA Yanniello. In fact, the prosecution team's own
investigation included the FBI's Joint Terrorism Task Force (JTTF), the FBI's
"Guardian Squad," and the FBI's eGuardian system.

## III.  ARGUMENT

### A.    Legal Standards Governing Disqualification and Recusal

#### 1.  Standard for Judicial Recusal

The principles at stake here are foundational. The Fifth Amendment guarantees
criminal defendants a fair and impartial tribunal; the Sixth Amendment guarantees a
fair trial. *See Tumey v. Ohio*, 273 U.S. 510, 523 (1927). These rights are codified in 28
U.S.C. §§ 144 and 455, which collectively require recusal whenever a judge's
impartiality "might reasonably be questioned," or s/he has "personal bias or prejudice"
or "personal knowledge of disputed evidentiary facts." 28 U.S.C. § 455(a), (b)(1).

> As the Supreme Court has cogently put it, the purpose of these statutes is:
> [T]o avoid even the appearance of partiality. If it would appear to a
> reasonable person that a judge has knowledge of facts that would give him
> [or her] an interest in the litigation then an appearance of partiality is created
> even though no actual partiality exists because the judge does not recall the
> facts, because the judge actually has no interest in the case or because the
> judge is pure in heart and incorruptible.

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859–60 (1988).

They demand recusal even when no actual bias is shown—the appearance of
partiality is enough. *Id.*; *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008).
Section 144 provides a procedural mechanism for disqualification based on actual bias.

10

It requires a timely and legally sufficient affidavit showing that the judge "has a personal bias or prejudice" against a party. *United States v. Sibla*, 624 F.2d 864, 867 (9th Cir. 1980). Even where an affidavit under § 144 is found procedurally deficient, the same facts must still be considered under § 455, which imposes an independent, self-executing obligation on judges to recuse whenever their impartiality might reasonably be questioned. *Id.* Beyond the bench, the same constitutional principles apply to the prosecution. Due process forbids the government from maintaining conflicts of interest or engaging in conduct that undermines the neutrality of the proceedings. *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803–04 (1987).

2.  Standard for Prosecutorial Disqualification

The Ninth Circuit has made clear that disqualification of an entire United States Attorney's Office is an extraordinary remedy—appropriate only in the most exceptional circumstances. *United States v. Williams*, 68 F.4th 564 (9th Cir. 2023). Under *Williams*, such a remedy requires: (1) a strong factual predicate demonstrating that the conflict or misconduct is institutional rather than individual; and (2) a showing that the Office's continued participation would result in an actual legal or ethical violation or otherwise compromise the fairness or appearance of fairness in the proceedings. *Id.* at 573. The Court cautioned that, because of the separation-of-powers concerns inherent in judicial oversight of the Executive Branch, office-wide disqualification should be ordered only when lesser remedies—such as recusal of individual prosecutors or internal screening—would be inadequate to eliminate the conflict. *Id.* At bottom, the inquiry under § 455(a) and the Due Process Clause asks whether "a reasonable and prudent person, knowing these objective facts, would harbor doubts about" whether the Court is impartial. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 875 (2009).

**B.    The Threats and *Ex Parte* Communications Require Recusal of the Central District of California Bench**

1.  The Appearance of Partiality is Sufficient Under § 455(a)

11

Magistrate Judge Donahue was the named victim of four recorded death threats that referenced Mr. Banks and Mr. Wilson by name. She presided over detention hearings, heard argument from counsel, and issued rulings in the weeks and months following those threats. Judge Fitzgerald later reviewed and relied on those rulings. Neither made any disclosure to defendants about the threats.

Even assuming the judges' actual impartiality, the appearance of impartiality has been lost. As the Supreme Court recognized in *Liljeberg*, recusal is required where an objective observer would have reasonable grounds to question the judge's impartiality. 486 U.S. at 860-61.

Moreover, the pattern of nondisclosure and *ex parte* communication over a period of seven months undermines both the appearance and the reality of fairness. Courts have long recognized that when threats to a judge are credible and not contrived by the defendant, recusal is required to preserve confidence in impartiality. *See United States v. Yousef*, 327 F.3d 56, 169 (2d Cir. 2003); *Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995); *United States v. Greenspan*, 26 F.3d 1001, 1006–07 (10th Cir. 1994); *United States v. Cooley*, 1 F.3d 985, 993–94 (10th Cir. 1993). Those cases, and *Holland* itself, distinguish between self-serving threats intended to manipulate the system and genuine, external threats that create an appearance of bias beyond repair. Where the latter exist—as here—recusal is mandatory.

Here, any reasonable observer would doubt the fairness of proceedings in which a magistrate judge—while being investigated as a victim of threats referencing a defendant by the prosecution team—continued to make critical pretrial rulings, and where the district judge later adopted those rulings without disclosure to the defense.

The Ninth Circuit's decision in *United States v. Holland*, 519 F.3d 909 (9th Cir. 2008), does not excuse the failure to recuse here; if anything, it underscores why recusal is compelled. In *Holland*, the defendant himself had personally obtained the sentencing judge's home telephone number and left a threatening voicemail before

12

sentencing. The district court revealed the call on the record and characterized it as an obvious attempt to manipulate the system. On appeal—reviewing only for plain error because no recusal motion had been filed—the Ninth Circuit affirmed, emphasizing that threats do not automatically require recusal where they are transparently manipulative, unserious, or intended to game the system. The court explained that recusal under 28 U.S.C. § 455 depends on both an objective appearance test and a subjective bias test: the judge must recuse when a well-informed, thoughtful observer would perceive a significant risk that the case will be decided on a basis other than the merits, or when the judge personally concludes he cannot be impartial. *Id.* at 913–16. The Ninth Circuit warned that judges must guard against letting defendants weaponize threats to obtain a new jurist, but also acknowledged that where credible threats exist, or where the appearance of partiality becomes unavoidable, recusal is required.

The circumstances here bear no resemblance to *Holland*. First, the threats in this case were not made by any defendant, but by outside individuals invoking Mr. Banks's name and threatening the lives of the magistrate judge, the lead prosecutor, and everyone who worked at the courthouse and the USAO-CDCA. There is no suggestion of manipulation by the defense, and no conceivable incentive to create such threats for tactical advantage. Second, unlike in *Holland*, where the judge deemed the threat trivial, made no referral to law enforcement, and proceeded after open disclosure, the threats here were taken with utmost seriousness by the government itself. Within days, the U.S. Marshals Service and FBI launched a full investigation under Section 7.5 of the FBI's Domestic Investigations and Operations Guide. The same FBI case agent leading this prosecution, Special Agent Sarah Corcoran, was designated as the point of contact for the threats investigation, prepared FD-1057 reports describing the threats, and coordinated with multiple agencies. The USAO-CDCA was directly involved throughout. That multi-agency response demonstrates the government's own

recognition that these were not empty or manipulative gestures—they were credible threats that triggered sustained federal law enforcement involvement.

The third and most critical distinction is disclosure. In *Holland*, the district court disclosed the threats before sentencing, allowing the record to be clear and adversarial. Here, the government and judiciary concealed the existence of the threats for more than seven months. Such communications violate both § 455(b)(1) (personal knowledge of disputed evidentiary facts) and the Code of Conduct for United States Judges, Canon 3(A)(4). The Ninth Circuit has long condemned undisclosed *ex parte* contacts between the government and the bench on matters bearing on the merits of a criminal case. But here, for months, the magistrate judge who had been the named victim of the threats presided over Mr. Banks' detention hearings and issued rulings that the district court later adopted. Meanwhile, the prosecution team—aware of and *participating in* the investigations—conferred privately with chambers and court security about the same threats, but never disclosed them to the defense. Only on October 1, 2025, did the government finally reveal that both the judge and the lead prosecutor had been targeted. That prolonged nondisclosure, and the pattern of *ex parte* communication it reflects, create precisely the appearance of impropriety that § 455(a) was enacted to prevent.

This distinction—between trivial, self-serving threats and genuine, externally generated ones—is precisely what other circuits have found determinative. In *United States v. Yousef*, 327 F.3d 56, 169 (2d Cir. 2003), the Second Circuit explained that recusal is required where a reasonable observer could question whether a judge who has been the target of a genuine threat could remain entirely impartial, particularly when the threat arises from sources beyond mere defendant manipulation. Similarly, the Tenth Circuit has consistently held that genuine threats compel disqualification to preserve both the reality and appearance of justice. In *Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995), *United States v. Greenspan*, 26 F.3d 1001, 1006–07 (10th Cir. 1994), and *United States v. Cooley*, 1 F.3d 985, 993–94 (10th Cir. 1993), the Tenth Circuit

14

recognized that where threats are not contrived by the defendant, but instead appear credible and provoke a legitimate security response, recusal is necessary to avoid "an appearance of partiality that reasonable members of the public could not ignore." These cases, read together, make clear that the duty to recuse turns not on the judge's subjective sense of safety, but on whether a reasonable observer would doubt the judge's impartiality under the circumstances. *See In re Nettles*, 394 F.3d 1001, 1002-03 (7th Cir. 2005).

Under *Holland*'s own framework, recusal is mandatory and every objective factor supports recusal. A reasonable observer, knowing that the presiding magistrate judge was the victim of a credible threat under active FBI investigation, that the prosecutors were simultaneously litigating before her while communicating privately about the threats, and that the defense was kept entirely in the dark, would unquestionably harbor serious doubt that justice could be seen to be done. Even assuming the judges themselves sincerely believe they can remain impartial, the appearance of impartiality is gone. As *Holland* itself recognized, credible threats create two unacceptable risks: that a judge will unconsciously temper rulings to defuse danger, or, conversely, that the judge will over-correct by favoring the government as a means of asserting control or deterrence. *Id.* at 915 n.6. Both possibilities erode confidence in the fairness of the proceedings. Unlike in *Holland*, where a single defendant's manipulative call was dismissed as unserious, this case involves third-party threats so grave that the federal government launched a full criminal investigations. Those circumstances—compounded by seven months of secrecy and *ex parte* communication—go far beyond what *Holland* tolerated. They strike at the structural integrity of the judicial process and compel recusal of the affected judges and reassignment of this case outside the Central District of California. Under *Yousef*, *Nichols*, *Greenspan*, *Cooley*, *In re Nettles*, and *Holland* itself, recusal is not optional— it is necessary to preserve both due process and the integrity of these proceedings.

15

**C.    The Government's Failure to Disclose the Threats and Resulting Criminal Investigations Requires Disqualification of the USAO-CDCA.**

From February through October 2025, the United States Attorney's Office for the Central District of California knew that both the presiding magistrate and the lead prosecutor were the victims of violent threats made in apparent support of Mr. Banks and Mr. Wilson. Despite that knowledge, the Office continued litigating this case before those same judges—relying on their detention rulings, conducting discovery conferences, and engaging in ex parte communications regarding courthouse security— without ever disclosing the threats to the defense. The result is an irreconcilable conflict of interest: the lead prosecutor, AUSA Yanniello, became both a victim and a participant in a criminal investigation closely tied to this case, while his office continued to prosecute it. By proceeding without recusal or disclosure of the inherent potential conflicts, the USAO effectively blurred the line between advocate and witness, compromising both the independence of the prosecuting authority and the integrity of the judicial process. *Young*, 481 U.S. at 803.

This was not a run-of-the-mill discovery dispute. The information that the government intentionally and actively withheld from the defense dealt with the very integrity, neutrality, and fairness of the proceedings. The death threats related not to discovery, but to the possibility of conflicts that would undermine the system itself. That the government cannot or will not see the stark reality—that what happened was wrong and unfair to defendants—is troubling beyond description.

In the government's telling, the defense was only entitled to know that the judges presiding over Mr. Banks' freedom had received death threats because the government decided to weaponize the threats in support of its bid for an anonymous jury. If the government never moved for empanelment of an anonymous jury, the government's position is that it could have withheld the death threats from the defense *forever*.

The conduct here is not limited to one prosecutor, like in *Williams*, but is institutional in scope. Multiple members of the USAO knew of the threats and coordinated with the FBI and U.S. Marshals Service—both agencies actively investigating the same threats—while litigating against the defendants. This spanned across two different offices of the USAO-CDCA, involved at least half of dozen members of the USAO-CDCA, and included leadership like AUSA Yanniello (Chief of National Security, role Magistrate Judge Donahue held when at the USAO-CDCA). This conduct has tainted the proceeding itself. As the Ninth Circuit emphasized in *Williams*, disqualification of an entire U.S. Attorney's Office is an extraordinary measure, but it is justified where the factual record establishes a pervasive conflict that poses a serious risk of undermining fairness or public confidence. *Williams*, 68 F.4th at 573. In *Williams*, the Ninth Circuit reversed a blanket disqualification because the record involved misconduct by only one prosecutor, not the entire office. But in doing so, the court reaffirmed that where the conflict is institutional, and where the government's conduct implicates the integrity of the proceedings themselves, disqualification of the whole office remains the proper remedy. *Id.*

Those are precisely the facts here. By February 25, 2025, the USAO knew of violent threats against Magistrate Judge Donahue. By April 28, 2025, AUSA Yanniello himself had been threatened. A full FBI investigation was launched back in February, with the same case agent assigned to this prosecution—Special Agent Sarah Corcoran—designated as the point of contact for the threats investigation. For the next seven months, while the magistrate judge who was the named victim of the threats presided over detention hearings and issued rulings later adopted by Judge Fitzgerald, the USAO remained silent. Only on October 1, 2025—just days before pretrial motions were due—did the Office disclose the existence of the threats. During that entire period, the prosecution team privately conferred with court personnel and law enforcement about the threats, while the defense remained completely in the dark.

17

Moreover, the conduct of the United States Attorney's Office was not an isolated act of poor judgment or individual misconduct; it was a sustained, institutional failure to disclose information that went to the core of the court's impartiality. And the USAO-CDCA has doubled and tripled down on their position. Dkt. 287 at 4 n.3.The USAO's decision to remain silent while the threatened judges continued to preside over the case violated both the letter and the spirit of § 455 and the Due Process Clause. It deprived the defendants of the ability to seek recusal, challenge adverse rulings, or evaluate whether judicial decisions were influenced—consciously or unconsciously—by fear, sympathy, or outrage.

The extraordinary circumstances here meet and exceed the *Williams* standard for office-wide disqualification. The conflict is not confined to one AUSA, but pervades the entire USAO-CDCA, which functioned simultaneously as victim, witness, investigator, and prosecutor. Under these conditions, no lesser remedy—whether screening individual prosecutors or substituting personnel—could restore public confidence or ensure fairness. The Department of Justice can assign this prosecution to another district. Only full disqualification of the USAO-CDCA can remedy the appearance of impropriety and assure the defendants and the public that this prosecution will proceed free from bias, conflict, and the lingering shadow of concealment.

### D. The Combined Misconduct Violates Due Process and Warrants Dismissal.

#### 1. The Structural Nature of the Violation

Due process demands not only the absence of actual bias, but also the absence of structural conditions that risk it. *Caperton*, 556 U.S. at 877. The defendants have been detained and litigated before judges who had reason to fear for their safety and against prosecutors who knew of those threats but concealed them. Such circumstances are

"structural errors" that defy harmless-error analysis. *See Arizona v. Fulminante*, 499 U.S. 279, 309–10 (1991).

### 2. The Government's Conduct Was Outrageous and Prejudicial

The government's decision to withhold the threats, the resulting criminal investigations, and *ex parte* communications, while simultaneously invoking generalized "security concerns" to justify extraordinary measures—like an anonymous jury—reflects deliberate gamesmanship. This conduct strikes at the heart of fairness and warrants dismissal. *United States v. Kojayan*, 8 F.3d 1315, 1324-25 (9th Cir. 1993).

### 3. Lesser Remedies Cannot Cure the Prejudice

Even full disclosure at this late stage cannot unwind the months of strategic and judicial decision-making that occurred under the shadow of undisclosed threats. Defendants cannot unring those bells, nor can the Court credibly reassure the public that rulings made under those conditions were unaffected. Dismissal is therefore the only adequate remedy. *See United States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir. 2008) (dismissal appropriate where prosecutorial misconduct causes "substantial prejudice").

**E.    Alternative Relief; In Camera Review; Evidentiary Hearing; and Reopening Pretrial Hearings.**

If the Court declines immediate dismissal or full disqualification, it should at least (1) order production or in-camera review of all threat-related materials and communications; (2) hold an evidentiary hearing to determine the scope of prosecutorial and judicial knowledge; (3) vacate all orders entered during the period of nondisclosure; (4) reassign the case to a judge outside the CDCA pending that review; and (5) reopen pretrial and detention hearings. Defendants request that the Court stay proceedings, and vacate the scheduling order, including the trial date.

## IV.    CONCLUSION

The record now before the Court reveals a breach of the fundamental promise of due process: that defendants be judged by a neutral tribunal and prosecuted by an unconflicted government. The USAO's decision to conceal threats to the very judges presiding over this case—and to continue litigating before them for months—has infected the proceedings with an appearance, and a reality, of unfairness that cannot be ignored.

The judiciary's legitimacy depends on public confidence that justice is not only done, but seen to be done. That confidence is shaken here. Defendants therefore respectfully urge the Court to dismiss the indictment or, at the very least, to disqualify the USAO-CDCA and reassign this matter to a district untainted by the government's nondisclosure.